(Judge Laubie of the Seventh Circuit, sitting in place of Judge Marvin.)

IN RE DISBARMENT OF FRANK E. DELLENBAUGH.

1. NATURE OF DISBARRMENT PROCEEDINGS.
    Disbarment proceedings are more in analogy with criminal proceedings than a civil action and the defendant will be given the benefit of any real uncertainty as to the evidence.
2. CONSIDERATION OF EVIDENCE IN SUCH PROCEEDINGS.
    In such proceedings where the evidence in regard to certain specifications is not deemed sufficiently clear to warrant a finding of guilty such evidence may be taken into consideration in determining the penalty imposed by virtue of a finding of guilty under another specification where there is a discretion as to the kind of penalty to be inflicted.
3. REMEDY FOR MISCONDUCT OF DEFENDANT WHILE ASSUMING TO ACT AS JUDGE.
    The remedy for any misconduct or wrong done while the defendant was acting or assuming to act in his capacity as a judge is in another tribunal and cannot be adjudicated in this proceeding.
4. EVIDENCE AS TO EXTORTION OF MONEY AS CHARGED IN FIRST SPECIFICATION.

The evidence given in respect to the first specification does not warrant the court in finding the defendant guilty of complicity in the extortion of money as charged.

5. EVIDENCE AS TO MANNING DIVORCE CASE.
The evidence shows that in the trial of the Manning divorce case the defendant acted or assumed to act in his official capacity.

6. EVIDENCE AS TO INDORSEMENT OF DECREE.
The evidence shows that the defendant after the expiration of his term of office and while a practicing attorney prepared a decree which he indorsed "O. K. Dellenbaugh, Judge," and by falsely stating that it was the original entry prepared and indorsed while he was judge procured the clerk to enter said decree upon the journals of the court.

7. EVIDENCE AS TO HEARING AND GRANTING OF DIVORCE IN THE MANNING CASE.
The evidence shows that the defendant acted corruptly in hearing and granting the divorce and in procuring the decree to be entered of record, and show no circumstance of exoneration in regard to the offense of which he has been convicted.

HALE, J.

In the matter of the proceedings against Frank E. Dellenbaugh for disbarment—the case is before us.

There was a sufficient discussion of the law applicable to the case on passing upon the demurrer, by my associate, and there will be no further discussion of the law.

In considering the evidence submitted on the trial of this case, we have found no fact against the respondent which was not supported by evidence clear and convincing.

We regard the case more in analogy with a criminal proceeding than a civil action, and have endeavored to give to the respondent the benefit of any real uncertainty arising out of a fair, careful and candid consideration of the evidence. More than this, no fact has been found against the respondent that has not only received the assent of each member of the court but the approving judgment of each member of the court. We believe that we fully appreciate the gravity of the charges made and the care with which every step should be taken in the consideration of this case.

The statute under which these proceedings are instituted is sec. 563 : "The Supreme Court, the circuit court, or the court of common pleas may suspend or remove any attorney-at-law from office, for either of the following causes : misconduct in office, conviction of crime involving moral turpitude, or unprofessional conduct involving moral turpitude." That is as far as we need to read the statute.

The charges made are under the first and third subdivisions of the statute which I have read. The respondent is charged with having been guilty of misconduct in his office as an attorney-at-law of the state of Ohio ; and, secondly, with having been guilty of unprofessional conduct involving moral turpitude. The facts relied upon in support of these charges, are embodied in three specifications of facts :

Specification-first, is, in brief, and in substance, that the respondent Dellenbaugh was, on or about January 30, 1895, employed by one Edith Manning as her attorney to render to her his professional assistance in relation to matters growing out of the alleged illicit relations between her husband, George A. Manning and one "Jane Doe ;" that after said retainer and while he was in the discharge of his duties incident thereto, the respondent was, on April 22, 1892, appointed and assumed the office and duties of judge of the court of common pleas of the third subdivi-

sion of the fourth judicial district of the state of Ohio. That notwith-
standing such appointment the respondent continued to act, under his
retainer, for Mrs. Manning. That about July, 1895, he associated with
him Vernon H. Burke, an attorney at this bar. That on or about July
6, 1895, Burke by the solicitation and at the request of the respondent,
wrongfully, corruptly, and by threats of exposure of the illicit relations
between "Jane Doe" and Manning and by promises to shield her from
exposure, obtained from her the sum of ten thousand dollars wrongfully
and corruptly. It is conceded that the sum of ten thousand dollars was
obtained; five thousand of it paid in cash, and notes for the remainder
taken. Of the five thousand dollars, ultimately Mrs. Manning received
two thousand dollars, and Burke, or Dellenbaugh and Burke received
three thousand dollars.

We refrain from entering into as full discussion of the evidence in
support and denial of the facts of this specification, as might be done,
for the reason that the facts therein contained, are relied upon to support
the charges made against Burke growing out of the same transaction,
who has not yet been heard in his defense.

Something, however, must be said as to the respondent's connection
with that affair.

Both the respondent Dellenbaugh and the witness Burke have given
their testimony before us. The respondent's statement is to the effect
that at the time he assumed the office of judge of the court of common
pleas on April 22, 1895, he withdrew from the case of Manning v. Mann-
ing and turned it over to Burke, and thereafter had nothing whatever to
do with the case. While Burke says that he was first called into the
case on or about July 6, 1895, and that before that time he had no knowl-
edge of the existence of such a case.

If we can rely upon the testimony of witnesses seemingly disin-
terested, neither of these statements can be strictly true.

It is conceded that Christian, a detective, was employed as a detective
in the case, by the respondent Dellenbaugh. The time of that appoint-
ment is fixed by the respondent to have been on or about April 1, 1895;
while the detective's testimony is to the effect that he was employed on
April 22d, and subsequent to the time that Judge Dellenbaugh assumed
his office as judge of the court of common pleas.

Christian, in the prosecution of his employment as a detective and
while engaged in that employment as we understand, was arrested and
brought before the mayor of the village of Glenville, and on a plea of
guilty a fine and costs, or costs, one or both, assessed against him.
This was on June 18, 1895. The next day after his arrest and after the
fine had been assessed, both Dellenbaugh and Burke appeared before
that official, and asked the release of the fine or judgment against
Christian for the reason that he was employed by them and was in
the legitimate prosecution of that employment, either employed by
one or both. Each attempts to say that he went to see the mayor and
that the interview was had at the instance of the other.

The more reasonable supposition or the more reasonable conclusion
from the evidence, is, that each was there because of his interest in the
case in which Christian was engaged.

Further, Christian testifies that his first acquaintance with Mrs.
Manning was an introduction to her in the criminal court room by Judge
Dellenbaugh. There was, according to the testimony of Christian and
Burke, a meeting at the Kennard House, in which were present Burke,

Christian and Dellenbaugh, and the subject matter of dealing with "Jane Doe" was there discussed to some extent—Christian and Burke both testified to that meeting; it is denied *in toto* by Judge Dellenbaugh.

We have, in the consideration of this testimony in these matters in which these two parties are so vitally interested thought it safer to take the testimony of the *third* party, who had apparently no interest in the case.

We are inclined to think that Judge Dellenbaugh is mistaken as to there being no such meeting at the Kennard House.

Again, as showing the connection of the respondent with the case, the money, as I have said before, came into the hands of Burke. Some of it was handled by the respondent, Dellenbaugh—there is a difference as to how and in what way it came into his hands—it was by checks. Those checks endorsed and drafts and certificate of deposit obtained and forwarded to Mrs. Manning. He settled with Christian—receiving the money from Mrs. Manning to do so. His statements before the investigating and trial committees, which he has corrected on this trial, gives some countenance from his own lips to the fact that he was engaged in the case later than he now says. In particular before the trial committee he referred to what is known as the Russell-Glenn affair, fixing on that event which he now says, learning that it occurred long after he went upon the bench, leads him to say that he was mistaken in referring to it as one of the events that he was cognizant of. · It would seem a little unatural that the time should be the prominent thing rather than the event.

Again, the parties are at issue in the testimony whether Judge Dellenbaugh received any portion of the three thousand dollars or of the thirty-three hundred dollars which was ultimately retained by Burke. Upon that issue we have, not only the statement of Burke as to the payment by him and the manner in which it was paid to Dellenbaugh but he produces a check of one thousand dollars drawn upon the same day that the settlement was made; the check shows that it was paid. There is no evidence so far as we remember, outside of the check itself as to just when it was paid, but, perhaps the fair presumption is that it was paid at its date. Now, if that thing is a fiction, the bank books would show something about it, whether Burke drew or did not draw upon that day the currency from the bank. There is no attempt to controvert that fact. Whether there is anything in the bank that would be of any service whatever, I am not prepared to say, because there is no evidence upon that point ; but the fact that Burke in connection with his testimony produces a check that was actually paid, is of some value.

Then, soon after this matter received its first airing through the newspapers, there was a meeting of the friends of Judge Dellenbaugh at the office of Wilcox, Collister & Hogan. There were two meetings in that office. At the first, several witnesses testified as to what Judge Dellenbaugh said and they differ as to the statements he is said to have made.. On the second occasion there were present Collister, Hogan, Henry and Dellenbaugh; they were then, at that time, interested for Judge Dellenbaugh ; and they Collister and Hogan both, say that he not only said that he had received one thousand dollars, but that he fortified it by saying that he had done the work in the case, and was entitled to it, that the case was done all but the finishing touches.

Now, looking to all the circumstances surrounding that transaction, they point in the direction that the respondent did get a portion of that

money.   In this we are not, as it will be seen, relying on the testimony of Burke only, who it is claimed is impeached by statements made out of court as detailed by witnesses, differing from those made on the trial. That testimony, of course, was incompetent as tending to establish or negative the main fact as to whether he did or did not receive it.   It is only competent to effect the value of Burke's testimony and was admitted for that purpose alone.   To what extent there was any substantial contradiction of facts, we need not discuss.

No one fact found by us rests upon the unsupported testimony of Burke, who, of course, is deply interested in the outcome of this transaction.

We find, however, that upon this question, his testimony is supported by the circumstances of the case and also by the admissions of the respondent.

So that we think that down to the time of the receipt of this money Judge Dellenbaugh was not keeping entirely aloof from the case. Burke's testimony, however, that he knew nothing of the case until July 6th, seems to be contradicted by other testimony upon which we ought to be able to rely.   Miss Kent's statement is that a day or two or a very short time before Judge Dellenbaugh took his place upon the common pleas bench, she with Mrs. Manning went to his office; that Mrs. Manning was there told that he must withdraw from the case, told by Dellenbaugh that he must withdraw from the case, that he would put it into the hands of Burke; that they thereupon went to Burke's office where Mrs. Manning was introduced to Burke and thereafter they frequently visited the office of Burke during the months of May and June, and witness Talcott says that his office adjoined that of Burke's, having the same reception room, that these parties at some time, Mrs. Manning and Miss Kent, were frequently at Burke's office over a period of a month or two,—but of course, that may have been later.   But after the receipt of this money and its distribution there was no call for the frequent visits of Mrs. Manning to Burke's office.

And we are inclined to think and to hold that during those months she was to some extent visiting Burke's office and that he had something to do with the case.

But, coming to the facts immediately connected with the transaction in which the money was obtained from "Jane Doe," what is the evidence?   Except what may be gathered from the testimony of Christian, and the circumstances some of which I have referred to, the witnesses, who knew about what took place just prior to, and during the time and immediately after that event, are the respondent Dellenbaugh, Burke who is jointly charged with the wrong then committed, and Miss Kent. Burke says the arrangement under which he went to see "Jane Doe," was made in the criminal court room at a meeting in which Mrs. Manning, Miss Kent, Judge Dellenbaugh and himself were present; that they there discussed the situation and he was, either at his own motion or at the suggestion of the Judge, the one who went to see "Jane Doe," discussed the matter with her, received from her a proposition of settlement, reported the result of the interview back to the meeting that he had left, and after much discussion it was agreed that the proposition that had been made should be accepted, he having arranged for a meeting at his office the next morning with "Jane Doe."   While Miss Kent says that at Burke's office there was a meeting between herself, Mrs. Manning and Burke, in which they went over the reports which the

detective had received, and there it was agreed that he, from that place, should go to see "Jane Doe;" that Burke left, did go, returned to the same place, and reported the result of the interview with "Jane Doe:" and that the next morning that there they discussed the propriety of making a settlement; the next morning a meeting was had at the office of Burke, and the whole matter closed up, and that Dellenbaugh was not there at all. Miss Kent's testimony is not entirely satisfactory to the court. The details of how that thing came up, and the way it was done, and the discussions had—but she is the only really disinterested witness. to that transaction—to the immediate facts of the transaction.

After giving a careful review of this as we are able, and under the rules that I had announced that we had adopted, if the fact of the respondent's connection with this transaction of obtaining this money was to be determined by a mere preponderance of the evidence, we should not hesitate to hold him equally responsible with Burke; but there is such a conflict of the evidence produced that we do not feel justified in finding that his responsibility for that particular transaction is established by clear and convincing evidence.

Specification Second, we overruled and the demurrer to the specification, for the reason that it is alleged that all that was done on the hearing and the determination of the divorce case was done by him as the attorney of Mrs. Manning and was in no sense a judicial act.

On the evidence produced, we hold that in the trial of that case, he acted or assumed to act in his official capacity as a Judge, and that the remedy for any misconduct or wrong done in connection therewith, should be in another tribunal.

Specification Third. Specification Third is, in substance, that on October 28, 1895, the respondent Dellenbaugh pretended to hear and decide the divorce case of Edith Manning against George A. Manning. That all the time he was the real attorney in the case although Burke, at his instance, was acting as the ostensible attorney for the plaintiff. That on, and prior to this time there was no entry of the case upon the trial docket of the court, nor was there any entry of the case upon any of the dockets kept in the office of the clerk or by him, and no entry was made by respondent indicating that the case had been heard and tried upon any docket, the only entry having been made upon the file wrapper containing the papers. And very soon thereafter, Judge Dellenbaugh's official term as judge of the court of common pleas expired, at which time no journal entry had been entered upon the journal. That thereafter, respondent corruptly conspired with, or instigated Burke to get upon the journals of the court a decree of divorce. That after an attempt through Burke to get upon the journals a decree not authenticated by any judge, and after the refusal the three judges or at least one of them, to authenticate such journal entry, and a refusal by said judges to allow said entry to be made, the respondent after the expiration of his term of office and while a practising attorney, caused another degree to be prepared, which he endorsed " O. K., Dellenbaugh, Judge," which he took to the clerk to whom he falsely stated that the journal entry then produced was the original entry prepared in the case and was by him while judge, during his term, endorsed as therein produced, and against the positive orders of one of the judges at least, induced and procured the clerk to enter said decree upon the said journals of said court. The entry was made upon a blank space on the journal, of date of October 28, 1895.

We are constrained to say that there is a web of wrong doing running through this whole transaction.

Evidence is produced on the part of the prosecution, that Dellenbaugh first was solicited on behalf of Mrs. Manning to obtain for her a divorce. The witness Hickox, testifies that he saw Judge Dellenbaugh for that purpose, inquired whether he would take a divorce case and whether he would take Mrs. Manning's case. That afterwards, he being told by Judge Dellenbaugh that he must see Mrs. Manning before deciding, went with Mrs. Manning to Dellenbaugh's office and there introduced her to Dellenbaugh and left. The judge says that he was introduced to Mrs. Manning by Mrs. Robinson of Pittsburg, at which time both Mrs. Robinson and Mrs. Manning were strangers to him ; he ignores the entire facts testified to by Hickox.

It seems to us that there has been an undue effort to get away from the divorce case and to bring into prominence the case for the alienation of affections.

If we can rely upon the testimony of Hickox, the original effort was for a divorce. However, we have shown most clearly we think, that the respondent kept a watch over the case of Mrs. Manning from the beginning or until the ten thousand dollars was received and distributed. The evidence is such in the case, that we are compelled to find that the respondent knew of the commencement of the divorce case ; that he was cognizant of the most extraordinary efforts and proceedings taken to keep the case from the public, including the substitution of the name of Webster as an attorney in the divorce case. He was, undoubtedly, informed of the agreement to shield "Jane Doe" from exposure and as a part of the plan to carry out that agreement the case was heard in the manner disclosed by the evidence,—I mean the divorce case, without a single entry upon any of the dockets or records of the court indicating that any case was pending. There was a trial such as it was, and a memoranda made on the file wrapper containing the papers, and this is all.

In this way the case was left when Judge Dellenbaugh left the bench. The journals of the court were then under the control of the judges of the court. It was for them to determine what journal entries should and what should not be upon the records of the court. If, on investigation, the judges had ascertained all the facts concerning the divorce case, as disclosed upon this trial they would have been fully justified in keeping from the records of the court that decree and insisting that the case be set down for trial and the case regularly tried.

Judge Dellenbaugh's official term had expired and he had no official authority over any of the court records.

It is conceded that there was an effort at some time to get a journal entry on the journal that had not been "O. K.'d."

Judge Lamson says that he was in Room One at the January Term, and it came to his knowledge through the clerk that there was an attempt to put upon the journal such an entry, which he stopped. Judge Ong succeeded him in Room One at the April Term. It is beyond dispute that Burke went to the clerk with a decree not authenticated or "O. K.'d." The clerk referred him to Judge Logue who was in Room Six; he interviewed Judge Logue who refused to make the entry by which the journal could be properly made. He returned to the clerk. The clerk thereafter took the journal entry himself, went to Judge Logue; some of the testimony showing that Mrs. Manning was with

him; the clerk does not remember that she was. Judge Logue still refused to allow the entry to go upon the journal, but suggested that they consult Judge Ong who was in Room One, which was done, and he not only refused, but directed that it should not be journalized. Thereupon the clerk handed the journal back to Burke with the instruction that none of the judges would authorize its entry. After that Judge Dellenbaugh comes to the clerk with a journal entry having upon it, " O. K., Dellenbaugh, Judge." He stated to the clerk that that was the original entry drawn, that it had been " O. K.'d" by him while upon the bench, and was all regular and should be entered. The clerk said to him " Well, that obviates all contradiction, and I will enter it." But he afterwards saw Judge Ong who again told him (the clerk) to keep it from the records.

It is conceded that there was this controversy over getting this journal entry upon the records. When did it take place? In the first place, Judge Logue says he was in Room Six when that happened. He was in Room Six in November and December, 1895 and in Room Six, January Term, 1896. Judge Ong was in Room One at the April Term, 1896. Judge Lamson was in number at the January Term, 1896. It seems to us very plain from the controversy that took place over this and from the statements of the judges, that that controversy took place in April, 1896, or at that April term of 1896.

Judge Dellenbaugh's explanation and statement to us, is, that on the day the case was heard before him, or on the following day a journal entry in the Manning case was handed him which he " O. K.'d " and gave back to Burke. That after the effort was made by Burke to get the first journal entry, he succeeded in finding this original journal entry in the office of Burke and took it to the clerk with the statement that we have stated.

Now both of these journal entries are typewritten. The stenographer who took the entries in shorthand and wrote them out upon the typewriter says that the first journal entry, the one that was not "O. K.'d," was made between October 12th, and November 11th, and she produced her note books at the time her deposition was taken. This journal entry is an exact literal copy of the journal entry produced here upon the trial, that was not "O. K.'d," letter for letter. The second decree according to the testimony of the stenographer was dictated to her between April 10, and April 16, 1896, and that, too, is an exact copy of the decree that bears the authentication of Judge Dellenbaugh.

There is no effort made to impeach these statements of the stenographer, or to show that there is any mistake about it or that there is anything suspicious about her note books. It corresponds with the recollection of Judges Ong and Logue. This is not all. This case had its number, 53176 at the time of its commencement; it went upon no indexes; it was not upon the appearance docket; it was upon no docket kept in the clerk's office. We find this agitation over the journal entry. The journal entry finally goes upon the record. And then we find,—in a general way I am speaking now,—we find it indexed with those cases that had their origin in the summer of 1896.

This particular case, we think from the testimony, was indexed from the journal to the appearance docket by Nicholas, and he began that indexing in April, 1896, if we have the testimony correct.

You take the alphabetical index where this case went upon that index, and the case before, No. 56,079 and 56,080, commenced in May,

1896, the one after No. 56,427 bears the date on commencement July 1, 1896. It was transferred to the execution docket. That is not so definitely certain an index, but it was transferred to an execution docket that was commenced the latter part of July or the first of August, 1896. It is said that this journal is in the handwriting of Brown, a witness. It is on a space left in the journal. Brown testifies to having made some mistake in the spacing of the journal, and correcting it afterwards. It is shown that the cases upon the spaces before and after the Manning case have not been changed. And as I have said the Manning case was indexed from the journal to the appearance docket by Nicholas.

It is said that a man by the name of Ewing who was the bailiff in Judge Dellenbaugh's room at the time the divorce was heard, received this journal entry and handed it to Judge Dellenbaugh. We have not the slightest idea that Ewing remembers this particular case, from his own testimony. Some of this testimony looks as though it was made to fit a theory rather than facts which parties really know.

It is perfectly apparent that the journal entry which Judge Dellenbaugh took to the clerk, bearing his "O. K." could not have been in existence at the time he left the bench, November 2, 1895, and the same was not and could not have been "O. K.'d" by him before that time, and that his statement to the clerk was not true. By these false statements the clerk was deceived and the express orders of the judges or at least one of them, was disregarded and evaded. Whatever the effect may be these are facts so clearly established, there can be no reasonable doubt of their existence.

We, therefore, find the charges made against the respondent sustained by the facts specified and alleged in this third specification.

Similar charges are made against Burke, growing out of the joint action of the parties, and we deem it best to withhold the fixing of any penalty in this case until that case shall have been determined. And this is all that we will undertake now to say about the case.

LAUBIE, J. (Rendered February 25th.)

I had not thought that it would be necessary for me to take any part in this case in announcing the results, but as my brother on the bench, Judge Caldwell, suggests to me that I relieve him of his duty in disposing of the Dellenbaugh case, I have thought proper to do so.

The statute governing proceedings of this character, prescribes two punishments where an attorney is found guilty of the charges found against him :

One is disbarment absolute, and the other is a modified form by suspension for a given period. And, in determining, of course, which of these punishments should be inflicted upon an attorney, the gravity and extent of the dereliction upon his part must be regarded. The court should take into account all matters in exoneration of the offense and of its gravity; and, on the other hand, should take into account all matters which form an aggravation as it were, of the conduct of the defendant, that is, those things which tend to show the gravity of the offense and the motive deliberated upon upon the part of the party in the performance of the criminal and unlawful act.

To show that, in undertaking to determine here the punishment to be inflicted upon Mr. Dellenbaugh, we have had regard to all the circumstances of this case. We have been somewhat enlightened in this view of it throughout the trial of Mr. Burke because the same matter

precisely was involved in each trial. We have not been able to find anything in the circumstances of the case, any matters which in any manner tend to exonerate Mr. Dellenbaugh of the gravity of the offense of which we have found, him guilty—Nothing that has been shown to us in either case, in the trial of either case, which in any manner exonerates him from the corrupt motive which is charged against him in the third specification of which he has been found guilty: On the other hand, many things have been developed by the testimony, which shows conclusively to the court the motive to have been deliberately corrupt and, therefore, to increase, as it were, the gravity of the offense of which he has been found guilty. The motive being found to have been a bad one, the gravity of the offense is fixed upon him indelibly in the mind of the court.

It may be remembered that my brother Hale in delivering the opinion in the Dellenbaugh case, made the statement that so far as the first charge against Judge Dellenbaugh was concerned, it is the same as the first in the Burke case; that if the question had to be determined or could be determined upon the mere preponderance of the evidence, the court would undoubtedly have found him guilty of it.

We have many cases where crime is deliberately charged against an individual not by criminal action, but by civil action by the party who claims to have been injured thereby; and where a conviction or judgment in the awarding of damages against the defendant establishes the fact for all practical purposes, that he was guilty of a crime known to the law.

The crime here in our state is defined by statute and therefore would have the tendency to disgrace the party and deprive him of his position in society almost as much as though he had been found guilty of a crime against the state, and yet in all these cases, almost universally, the issue is to be upon the preponderance of the evidence.

In this case, taking the gravity of it into consideration, and its other characteristics, we determine that it would be unjust to find the party guilty of charges of this character unless it were upon clear and convincing evidence, evidence that is so near to being beyond a reasonable doubt that one could hardly distinguish between the two.

It was on one point in this first charge, and on one point only, that the court has this reasonable doubt, and it gave the benefit of that doubt to Mr. Dellenbaugh as to whether or not he knowingly participated in the threats made to "Jane Doe" and the promise to shield her from disgrace, in order to obtain this ten thousand dollars. There was a conflict of evidence upon that proposition. To convict him of that, the case must have rested upon the testimony alone of Mr. Burke. There was other testimony which contradicted the statements of Mr. Burke. Miss Kent denied his statements. Christian, the detective, himself told that he had made no reports whatever to Judge Dellenbaugh, and had been retained by him about April 22, or 23, 1895, to investigate this matter, and had made no reports to Dellenbaugh, and he testified that Burke had got those reports. And so it was that some doubt was thrown upon the proposition as to whether or not Dellenbaugh had participated in that unlawful act. Now, there it rested. Is Judge Dellenbaugh to be cleared entirely in determining the punishment to inflict upon him, is he to be cleared entirely of the criminating circumstances shown in that first specification? Clearly not. We could not take Mr. Burke's statements as against this contradiction and contradictory witnesses, and say that Dellenbaugh did participate in this unlawful method of obtaining this

money. We could not use Burke's testimony in that way against Dellenbaugh, although we felt that substantially it was true. We had to reason from the effect of his statement, the conclusion to be derived from the circumstances at law; as against Burke, we could do that, and we did do it. As against him we can take his statements with the qualifications and circumstances thrown around them. While he undertook to exonerate himself, yet the facts indelibly impressed upon the court all the characteristics of blackmail: No other explanation could be given of it; that a woman, young and unmarried, should be approached as she was and within a few hours compelled to disgorge ten thousand dollars, unless threats had been made against her to disgrace her, and subsequent transactions show she would not have paid it unless she had been granted protection. So that we could use these circumstances and conduct against him, but we could not use it as against another man very well. So we gave to Mr. Dellenbaugh the benefit of the doubt. And as I have already said, the incriminating circumstances show by that evidence in connection with the first charge, that they must be taken into consideration against him when we undertake to fix the penalty.

As to the second charge in regard to the divorce, it was stated by my coadjutor, Judge Hale, that we could not regard that specification of the charge because it was substantially a charge against him of corrupt action as a judge, done in his character and capacity as a judge. Of course, so far as the law of the case in that respect was concerned in the whole transaction, it had already been settled in this court by a demurrer.

While I had very grave doubts as to the jurisdiction of the court to try Judge Dellenbaugh while he was upon the bench, yet substantially we had nothing to do with that in the trial because, as I have already said, it had already been determined by that court that it did have jurisdiction, but we were unanimous in the expression of the opinion that in regard to the specification and charge named in the second, we had no jurisdiction; that whatever offense had been committed in his character and capacity as a judge and that it devolved upon some other tribunal and in some other proceeding to touch him in his judicial act and capacity. But, again, as reflecting upon that opinion in which we did find him guilty, as developing incriminating circumstances showing the motive with which he acted, we had a perfect right to and we did look to the facts and to the circumstances that had developed in regard to that charge, upon the trial.

We were of the opinion that it was beyond question that in the beginning Judge Dellenbaugh was retained, not in reference to the alienation of the affections of the husband, but for a divorce. This lady, Mrs. Manning, had already left her husband; they had already been separated one from the other; the conjugal relation had been parted between them; there was nothing staring her in the face but divorce, she was anxious for a divorce, as was developed by the subsequent statement of facts. The very fact that this decree had not been entered upon the record of the court was developed through her anxiety to be re-married, —this woman whose feelings had been so lacerated that they required twenty-five thousand dollars to appease them, was soon, after the divorce, looking for a second husband, and took one, and the necessity arose to show that she had been legally divorced, and that we believe at the very threshold of the case developed the fact that the decree had not been entered of record. Every thing points to the fact that one of the wit-

nesses when he took Mrs. Manning to Dellenbaugh in the first instance and made her known to him, did this for the purpose of having him as her attorney for obtaining a divorce. Now, the facts show that after he had proceeded as her attorney in obtaining the evidence necessary to obtain that divorce for her on the sole ground upon which she declared she would accept it,—the sole ground, because she was an Episcopalian or a Catholic, more particularly as an Episcopalian, was, that her husband should have been shown to have committed adultery, and the ground of adultery was to be her basis for a divorce, and the only ground that she could accept it with due regard to her religious convictions. So that, with that object in view, detectives were put upon the track of her husband and of this "Jane Doe" and proof might have been obtained that illicit intercourse must have taken place between them as she was seen with him night after night until towards morning hours, and in houses of prostitution as assignation houses are.

Now, with that situation of affair Judge Dellenbaugh directs as we have found the character of the petition for divorce, that it is to be filed on his cognizance with all secrecy that is thrown around it,—he directs that it shall be kept from the public, knowing it to be an agreement with "Jane Doe," to be absolutely in accordance with the agreement with her to prevent the fact becoming public that "Jane Doe" had paid ten thousand dollars to be relieved of that publicity. With all these proofs staring him in the face and the name of Manning not appearing anywhere upon the records of the court in this case, everything hidden, and in the private room adjoining the court room in which Judge Dellenbaugh was then holding court as a judge, he who had been attorney for the purpose of obtaining her divorce, he who had received eleven hundred dollars growing out of the transaction as a fee, after he had retired from the bench, took cognizance of this case, directed it in all its particulars, and granted the divorce, as we must assume, upon the ground of adultery, from this testimony, when there was before him no person legally competent to tell of Manning's conduct—illicit conduct with "Jane Doe."

Now, having not while upon the bench signed any decree carrying out his announcement or having seen any decree, knowing finally that no decree had been entered,—with all these facts staring him in the face, after he gets off the bench he falsely represents that he had O. K'd the decree while still a judge, and he thus obtained a record of the decree to Mrs. Manning of a divorce upon the ground that I have stated.

It seems now, that this matter is so closely interwoven and connected, following each fact so closely one after the other, being so closely connnected and consequently that it is impossible to separate them. They show the motive in the misrepresentation to the Clerk of the Court, then carried to the judges who were at that time holding court and had control of the records of that court, that he had not only heard that case and granted that decree, but that he had O. K.'d the journal entry before he had left the bench. He had corruptly heard the divorce ; he had corruptly granted it perhaps, if he granted it at all and I presume he did, that he did it corruptly, and it follows as a necessary consequence that when he exerted himself as an attorney afterwards to get that decree entered of record, he was simply carrying out all of the corruption and corrupt motive that had animated him before.

These are the reasons why, stating it in short, that we know of no circumstance of exoneration in regard to this offense of which Judge

Dellenbaugh has been convicted; that all the circumstances are of a criminal nature and show conclusively the corrupt intent in all that he did, and that it was corrupt and unprofessional and could have proceeded only from a corrupt motive.

The result is:    The judgment in the case against Dellenbaugh will be as in the Burke case, disbarment.

Judge Caldwell:    The entry will be drawn in this case showing the motion filed for a new trial on behalf of Burke.

Mr. Foran :    Exception; and I wish to be heard in that case.

Judge Caldwell:    Yes, and do you want findings of fact?

Mr. Foran :    Yes.

Judge Caldwell :    We will fix the compensation at $100.00 for each member of the committee in the case, and provide for the stenographer, —a large part of the work has been done by a stenographer,—and I think the Court will authorize her to be paid by the county.

The costs in the Dellenbaugh case will be paid by Dellenbaugh.

The costs in the Burke case will be paid by Burke, aside from those I have mentioned.

*J. G. White*, *E. J. Blandin*, *A. T. Hills*, and *Alex. Hadden*, counsel for prosecution.

*J. E. Ingersoll*, *W. W. Boynton*, and *Thos. H. Hogsett*, counsel for respondent.